**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **Theresa Cosentino, on behalf of herself and others similarly situated,** | ) ) | |
| Plaintiffs, | ) ) | **Case No: 12 C 3627** |
| v. | ) ) | |
| | ) | **Judge Ronald A. Guzmán** |
| **Transcend Services,** | ) | |
| Defendant. | ) | |

**ORDER**

For the reasons stated below, Transcend's motion for decertification [264] is granted.

**STATEMENT**

Plaintiffs, a group of medical language specialists ("MLSs"), bring this collective action under the Fair Labor Standards Act ("FLSA") for overtime and minimum wage violations. The Court granted Plaintiffs' motion for conditional certification and approximately 705 MLSs have opted in. The parties engaged in significant discovery, including a total of 35 depositions, and Transcend now moves to decertify the class.

**Facts**

The MLSs work from home providing medical transcription and medical text editing services for Defendant's clients, which include large acute care facilities and various medical clinics. (Pls.' Ex. 5.) The MLS's job entails sitting at a computer station, downloading audio files of medical dictation via the Internet, transcribing those dictations into written form, editing transcriptions and returning completed jobs via the Internet. (*Id*.) The MLSs download a medical transcription software platform onto their home computers to transcribe and edit the medical reports. (Pls.' Ex. 34, Robertson Dep., at 74.) According to Defendant's Vice-President of Human Resources, Donna DonFrancesco, MLSs use one of seven transcription platforms. (Def.'s Ex. 1, DonFrancesco Decl.,

¶ 5.)

The MLSs record their own time and are paid primarily based on their production, not on an hourly basis. (*Id.* ¶ 7.) Specifically, the MLSs earn a rate of compensation per line or report produced or edited. (*Id.*) According to DonFrancesco, the production rates of compensation vary depending on the customer, account, transcription platform and the regional operations manager ("ROM") to which the MLS is assigned. (*Id.* ¶ 8.)

Defendant's MLS New Employee Orientation presentation states that "[a]ctual work time must be recorded on a daily basis and accurately reflect your work time" and that "[t]he hours being captured is actual time spent working, not running errands, doing laundry, walking the dog, etc." (Def's. Reply, Ex. 2, Dkt. # 276-2, at 4.) Further, the MLS Employee Handbook indicates that all hourly and production-based employees are required to submit their time worked through the TimeSaver program, and that "[e]mployees will enter the total number of hours actually worked on a daily basis at the end of each work shift." (Def.'s App., Ex. 2, Dkt. # 251-2, at 24.) Moreover, the Employee Handbook states that the failure to accurately record one's time could result in disciplinary action up to and including termination. (*Id.*)

**Analysis**

The FLSA allows an action to "be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). At this stage of the certification of a collective action, after conditional certification has been granted and discovery has taken place, "the examination [of the proposed class] is more incisive, and the additional information [obtained during discovery] may urge that certification be revoked, or the class divided." *Vergara v. Clarence Davids & Co.*, No. 12 C 7245,

2014 WL 1715443, at *2 (N.D. Ill. Apr. 30, 2014). "The burden is on the plaintiffs to show that they are 'similarly situated,' as required by the statute." *Russell v. Ill. Bell Tel. Co., Inc.*, 721 F. Supp. 2d 804, 811 (N.D. Ill. 2010). As noted by another court in this district:

> [d]uring this second stage analysis, a court reviews several factors, including (1) disparate [or shared] factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations.

*Id.* (citation and internal quotation marks omitted, alterations in *Russell*). Although plaintiffs in a collective action need not be situated identically, there must be "an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws." *Blakes v. Ill. Bell Tel. Co.*, 11 C 336, 2013 WL 6662831, at *10 (N.D. Ill. Dec. 17, 2013) (internal quotation marks and citation omitted). "In analyzing similarity, the court looks to factors like the plaintiffs' job locations, duties, supervision, and common policies." *Id.* "Where individualized circumstances and questions predominate over common issues, decertification is appropriate." *Id.*

In response to Defendant's motion to decertify, Plaintiffs assert that Defendant's common policies and practices that are in violation of the FLSA bind them together. For example, Plaintiffs assert that Defendant maintained uniform policies and practices to underreport compensable work time. Specifically, Plaintiffs contend that Defendant routinely instructed Plaintiffs to report only "production" or "hands on keyboard" time in TimeSaver, which did not include other tasks such as researching, e-mails, phone calls, computer problems and elective training. (Pls.' Resp., Dkt. # 273, App. 1.) Plaintiffs also argue that Defendant's production and performance quotas constitute a common policy binding Plaintiffs together. According to Plaintiffs, Defendant's production standards were unattainable in a 40-hour workweek but at the same time, they were instructed not

3

to report all of their productive worktime or were required to obtain pre-approval of overtime.[1] Finally, Plaintiffs argue that Defendant's uniform half-time overtime policy violates the FLSA.

Defendant moves to decertify on the ground that individual inquiries predominate over common issues of fact and law.

Factual and Employment Settings

The individual employment settings of the MLSs indicate that decertification in this case is appropriate. With respect to determining whether a plaintiff in this case has a minimum wage or overtime claim, the unique circumstances of each MLS's productivity, timekeeping method, interpretation of compensable time, and specific directions from the MLS's supervisor would need to be considered. *Camilotes v. Resurrection Health Care Corp*, 286 F.R.D. 339, 346 (N.D. Ill. 2012) ("A collective action is not appropriate when determining whether a plaintiff has a viable claim requires a detailed, fact-specific inquiry.")

For example, the MLSs are paid on a piece-rate system (*i.e.*, so many dollars per job) under which they "earn[] a rate of compensation per line or report produced." (Pls.' Resp., Dkt. # 273, at 7.) Accordingly, their earnings depend on their own time-keeping methods and efficiency. Some MLSs testified that they worked far in excess of 40 hours per week, while others did not. (Def.'s App., Ex. 37, Wingler Dep., at 162 (stating she worked 30 to 40 extra hours per week); *id*., Ex. 18,

---

[1] As to the policy regarding production and performance quotas, Plaintiffs fail to indicate how these requirements constitute violations of the FLSA. While Plaintiffs acknowledge that Defendant required MLSs to gross at least $900.00 each pay period to remain a full-time employee or $450.00 to be considered part-time, and that "[n]ot meeting Defendant's production quotas meant MLS termination, demotion [to part-time status] or discipline" (Pls.' Resp., Dkt. # 273, at 9), they do not point to any provision of the FLSA these quotas violate. Plaintiffs argue that Defendant *knew* that the production quotas were unattainable (apparently without working overtime), but point to no record evidence supporting this statement.

Marques Dep., at 182-83 (stating she had no idea how many hours over 40 she worked each week or how many weeks she worked less than 40 hours).) Plaintiffs practiced different methods of documenting their work time, including writing detailed notes or keeping track in their head, while some did not track their hours at all. (*Id*., Ex. 16, Lindquist Dep., at 95; *id*., Ex. 24, Pence Dep., at 184; *id*., Ex. 18, Marques Dep., at 58.) Kandace Chancey testified that her Team Leads told her to determine the number of hours she worked by taking the number of lines she edited and divide by 300 and the number of lines she typed and divide by 150. (*Id*., Ex. 5, Chancey Dep., at 159.) Sheila Reeser stated that her entries on Time Saver were "pretty sporadic" and that she could not recall the weeks she worked above, below, or at 40 hours. (*Id*., Ex. 27, Reeser Dep., at 46-48.) Thus, determining the actual number of hours each Plaintiff worked, and whether an overtime or minimum wage violation occurred, is necessarily an individual inquiry.

Moreover, some MLSs claim they received Markup to Minimum ("MKM"), which ensured that they received at least minimum wage and any overtime the FLSA requires, while others state they have never heard of it. (*Id*., Ex. 4, Bargerstock Dep., at 139 (stating she received MKM pay); *id.*, Ex. 7, Cosentino Dep., at 208 (stating she had never heard the term MKM); *id*., Ex. 9, Denio Dep., at 180 (stating that because she was such a fast typist, MKM was never an issue for her since "the faster you are, you come nowhere near minimum wage" and that "[e]ven if you're not getting work, you do fine").) In addition, at least one MLS was paid by the report, not by the line, and another was paid by the line or report depending on the subject matter of the report. (*Id*., Ex. 37, Wingler Dep., at 20; *id*., Ex. 15, Keenan Dep., at 76-77.) One MLS, Julie Wright, worked also as a Team Lead and in quality assurance simultaneously at various points during her employment. (*Id*., Ex. 38, Wright Dep., at 154, 180.) As a Team Lead, she earned an additional $700.00 per week and

5

in the quality assurance position she earned $17.50 per hour in addition to her line rate productivity. (*Id*. at 158, 181.) Also, Diane Martin earned double her non-production hourly rate for performing work related to Instant Text training during the same period she also received wages for her per-line productivity. (*Id*., Ex. 19, Martin Dep., at 42-45.)

In addition, the MLSs who were deposed testified as to different understandings of what "productive" or "hands on keyboard" time meant. While some interpreted it to mean their entire shift, others interpreted it to exclude research time on the computer. (Def.'s Mem. Supp. Mot. Decertification, Dkt. # 265, at 28-29.) Further, one MLS testified that she worked during the day as it suited her personal schedule while another stated that she was told to work only during her scheduled hours. (*Compare* Def.'s App, Ex. 11, Failla Dep., at 109 *with id*., Ex. 32, Spencer Dep., at 120.) These examples from among the 35 plaintiffs and opt-ins out of 705 who were deposed demonstrate the unique circumstances applicable to many of the MLSs.

Not only would individual inquiries thus need to be made to determine liability under the FLSA, but damage determinations would be unmanageable. The Seventh Circuit's case, *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013), is instructive on this issue. In *Espenscheid*, the district court certified several subclasses of home satellite technicians seeking relief for overtime and minimum wage violations under the FSLA but later decertified them "when it became apparent that the trial plan submitted by the plaintiffs was infeasible." *Id.* at 773. The *Espenscheid* court noted that the plaintiffs, who worked on a piece rate system, only sought damages:

> And to determine damages would, it turns out, require 2341 separate evidentiary hearings, which might swamp the Western District of Wisconsin with its two district judges. For it's not as if each technician worked from 8 a.m. to 5 p.m. and was forbidden to take a lunch break and so worked a 45–hour week (unless he missed one

or more days because of illness or some other reason) but was paid no overtime. *Id*. The Court noted that the suit charged the defendant with concealing its FLSA violations "by forbidding the technicians to record time spent on certain tasks" so each technician's damages could not be computed "effortlessly, mechanically, from the number of days he worked each week and his hourly wage." *Id*. Instead, the damages inquiry for each class member would vary depending on their efficiency and the tasks performed by each technician. *Id*. Indeed, "when one is paid by the job rather than by the hour, the hourly wage varies from job to job and worker to worker." *Id*. at 774. That is the case here. Each MLS worked at a different pace; indeed, one MLS testified that she experienced significant differences in her efficiency depending on the account and the quality of the audio recording. (Def.'s App., Ex. 24, Pence Dep., at 45- 47 (describing one account as "horrible" because "they had so many piddly specifics that they wanted," indicating that it often took longer to edit transcripts than transcribe them due to poor "voice recognition capture" and that she had to "basically retype" many transcripts during the editing phase); *id.*, Ex. 9, Denio Dep., at 183 (stating that MLSs typed at different speeds, and factors affecting the speed of transcription included "doctor factors, accents, fast talkers" as well as "MLS factors, like arthritic hands, or, . . . an illness" and agreeing that some MLSs simply typed faster than others).)

Plaintiffs contend that they can "calculate damages through representative testimony and data generated by Defendant's platforms and proficiency reports." (Pls.' Resp., Dkt. # 273, at 38.) Specifically, Plaintiffs state in footnote 16 of their response brief that:

> Defendant produced data showing the precise times 35 Plaintiffs downloaded and submitted medical reports. Defendant also produced MLS proficiency reports. Subject to Defendant's full compliance with discovery obligations, Plaintiffs will rely on electronic data of work time, MLS proficiency reports, plus Plaintiffs' own representative testimony to demonstrate damages.

(Pls.' Resp. Dkt. # 273, n.16, at 19) (internal citations omitted.) Further, Plaintiffs note that Defendant's Editing Proficiency Tutorial tracked weekly data regarding the actual hours worked by an MLS, minutes of audio edited, edited lines per hour, estimated active time editing medical reports, and the pause percentage of each particular MLS. In addition, Plaintiffs note that Defendant possessed reports demonstrating precise times Plaintiffs downloaded and submitted medical reports.

As to the latter, Plaintiffs point to their Exhibit 35, which is a listing of reports downloaded and returned by a particular MLS on July 24, 2011, generally asserting that these can be used to calculate damages across the board. One excerpt is as follows:

```
UserID      Job        DateTimeStamp              Description
----------  ---------  -------------------------  -----------
JStGeorge   33394559   2011-07-24_15:42:42.170    Downloaded
JStGeorge   33394559   2011-07-24_16:28:21.117    Returned
JStGeorge   33395446   2011-07-24_15:43:13.360    Downloaded
JStGeorge   33395446   2011-07-24_17:11:19.800    Returned
```

(Pls.' Ex. 35, Dkt. # 271-35.)

Defendant contends that the download reports do not provide a basis for computing damages in an accurate or consistent manner. It notes, for example, that while MLS St. George downloaded job number 33394559 at 3:42 p.m. and returned it at 4:28 p.m., she also downloaded job number 33395446 at 3:43 p.m. and returned it at 5:11 p.m. Thus, she had two reports open at the same time and Plaintiffs do not explain how they can determine how much time MLS St. George spent on each report or whether she took a break during the time the reports were open.

As to the proficiency reports, Defendants contend these actually demonstrate that there is no overtime issue in this case. Defendant points to MLS Cosentino's proficiency report, which indicates that her Estimated Active Time Editing for the week of January 9, 2011 was 14.13 hours.

(Def.'s Reply, Dkt. # 276, Ex. 3.) But her self-reported time record in TimeSaver indicates that she worked 40 hours that week. (Id., Ex. 4.) Not only are these records wholly contradictory as to the amount of time MLS Cosentino worked during the week of January 9, 2011, but Defendant argues that reconciling this type of variance would require a specific inquiry into MLS Cosentino's particular situation for that particular week. Extrapolating the inquiry for over 700 MLSs for a period of three years becomes completely unworkable and demonstrates that individual inquiries predominate over common questions of law or fact.

For their part, Plaintiffs do not address the discrepancies nor do they propose a calculation or formula for accurately estimating damages across class members; instead, they make broad statements completely lacking in specificity. (Pls.' Resp., Dkt. # 273, at 33 ("Plaintiffs will use Plaintiffs' testimony and Defendant's records produced during discovery to determine the amount of time Plaintiffs worked without compensation in violation of the FLSA"); *id.* at 34 ("Plaintiffs may compute accurate damage calculations through electronic platform data, Defendant's proficiency reports, and Plaintiffs' testimony."); *id.* at 37 ("Plaintiffs' damages will be presented in a straightforward manner . . . . [and] [t]he result is a mathematical formula common to all class members. . . ."); *id.* ("Resolution of damages may be easily achieved by using Defendant's platform records and proficiency reports data, along with Plaintiff's testimony regarding hours worked to calculate damages class-wide.").) Plaintiffs contend that they are "neither proposing a methodology that varies from person-to-person nor proposing a method that fails to account for damages on a class-wide basis," which is true, since they propose nothing. (*Id.* at 37.)

Plaintiffs state that they "are not necessarily adverse to using sub-classes or trying this case on a bifurcated basis if necessary and will comply with court direction on trial presentation." (Pls.'

Resp., Dkt. # 273, at 39.) But again, they offer no concrete proposals for subclasses or even suggest vague parameters for breaking the class down into subclasses in a manner that would facilitate damage calculations. Moreover, bifurcation may facilitate resolution of liability but it does not address the issue of individualized damages.

Further, Plaintiffs' superficial reference to representative testimony as an "appropriate case management tool" is unavailing. Not only do Plaintiffs fail to specify which class members would offer the purported representative testimony, they do not explain how the representatives would be chosen. *Espenscheid*, 705 F.3d at 774 (noting that plaintiffs' proposal of representative testimony failed to explain how the representatives were selected, "whether for example they were volunteers, or perhaps selected by class counsel after extensive interviews and hand picked to magnify the damages sought by the class"). And, as noted by the *Espenscheid* court, even if one assumes that the representatives chosen by class counsel were, by "pure happenstance," representative to the extent that the average numbers of hours they worked but were not paid is equal to the average numbers of hours for the class, one could not calculate the damages of all members of the class. *Id*. This is so because "[t]o extrapolate from the experience of the 42 to that of the 2341 would require that all 2341 have done roughly the same amount of work, including the same amount of overtime work, and had been paid the same wage," but "[n]o one thinks there was such uniformity." *Id*.

Contrary to Plaintiffs' assertion, *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680 (1946), *superseded on other grounds by statute*, Portal to Portal Act of 1947, 29 U.S.C. §§ 251–62, does not stand for the proposition that plaintiffs in a class action may always use representative testimony when an employer has failed to keep proper time records. In *Anderson*, the Supreme Court stated that if an employer has failed to keep proper time records in accordance with its statutory duty, "an

employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* at 687. As noted by the Seventh Circuit, however, "what can't support an inference about the work time of thousands of workers is evidence of the experience of a small, unrepresentative sample of them." *Espenscheid*, 705 F.3d at 775. Thus, *Anderson* fails to solve Plaintiffs' problems regarding its proposal to use representative testimony.

Nor do Plaintiffs address how to deal with payment under the piece-rate system because "[w]hen one is paid by the job rather than the hour, the hourly wage varies from job to job and worker to worker." *Id.*

*Espenscheid* is clear that the plaintiffs are required to set forth "a feasible litigation plan," but they did not. Indeed, when Defendant came forward with a detailed challenge to Plaintiffs' ability to establish a consistent and accurate manner by which to calculate damages for the entire class, Plaintiffs wholly failed to respond, offering only vague references to "mathematical formulas" and "accurate damage calculations" without specifying what those are. As noted by the *Espenscheid* court, "if class counsel is incapable of proposing a feasible litigation plan though asked to do so, the judge's duty is at an end." *Espenscheid*, 705 F.3d at 776. *See also Camilotes,* 286 F.R.D. at 354 (granting decertification motion, noting that "[a]lthough Plaintiffs contend that 'numerous mechanisms are available to this Court at trial to allay any fairness or procedural concerns,' they fail to propose any specific trial plan, nor do they propose any specific potential subclasses" and "[g]enerically stating that unspecified mechanisms may exist is not sufficient to allay the Court's manageability and fairness concerns, especially given the plethora of individualized factual issues

11

in this case.").

### Fairness and Procedural Concerns

Plaintiffs invoke fairness and procedural considerations in support of their position that the class should remain certified. Class actions are an "ingenious procedural innovation" which are "especially important when each claim is too small to justify the expense of a separate suit, so that without a class action there would be no relief, however meritorious the claims." *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014). However, certain cases may arise in which numerous class members are "harmed to a different extent" such that the efficiencies provided by resolution for a class or subclasses are lost. *Espenscheid*, 705 F.3d at 776. Although Plaintiffs, in opposing decertification, contend that "[i]t is logical and advantageous to allow the[m] . . . to pool their resources and for the Court and parties to not toil through hundreds of individual trials" (Pls.' Resp., Dkt. # 273, at 23), they offer no solutions to the significant problems posed by the individual damages inquiries discussed above. Indeed, as the case now stands, proceeding with a class would result in exactly what Plaintiffs seek to avoid – "hundreds of individual trials" on damages. Without any proposal of a workable methodology in this case, Plaintiffs' assertion that "individualized inquiries into damages do not necessarily require decertification, so long as damages stem from the defendant's common policies and are capable of determination through a uniform methodology" rings hollow. (*Id*. at 36.)

As noted by the Supreme Court:

> What matters to class certification . . . is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common

>answers.

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (citation and internal quotation marks omitted).

**Conclusion**

For these reasons, Defendant's motion to decertify [264] is granted.

**Date**: September 25, 2014

_____
**Ronald A. Guzmán**
**United States District Judge**